UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| IN THE MATTER OF THE SEARCH OF: | |
|---|---|
| One Red iPhone recovered from 1050 Brushton Avenue Apartment D on January 31, 2020, and currently in the custody of the Pittsburgh Bureau of Police | Magistrate No. 25-252 |
| One LG smart phone recovered from 1050 Brushton Avenue Apartment D on January 31, 2020, and currently in the custody of the Pittsburgh Bureau of Police | Magistrate No. 25-253 |
| One TCL smart phone recovered from 1050 Brushton Avenue Apartment D on January 31, 2020, and currently in the custody of the Pittsburgh Bureau of Police | Magistrate No. 25-254 |

## APPLICATION/AFFIDAVIT FOR SEARCH WARRANTS

I, Task Force Officer William Churilla, having been duly sworn, depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

Your Affiant, Task Force Office William Churilla, being duly sworn according to law, aver that the following is true and correct to the best of my knowledge, information and belief and is based on personal knowledge or information provided by reliable sources.

Your Affiant is a member of both the Pittsburgh Bureau of Police (PBP) and is also a Task Force Officer with the Drug Enforcement Administration (DEA). As a Pittsburgh police officer, I am empowered under state law to make arrests for violations of state criminal laws, and I am also empowered to execute state search warrants. As a DEA Task Force Officer, I am empowered under federal law to make arrests for violations of federal criminal laws, and I am also empowered to execute federal search warrants.

I have a High School Diploma, as well as a bachelor's degree in criminology and Business Management from Duquesne University. After my 1988 graduation from Duquesne University, I worked for approximately 5 years with juveniles adjudicated of crimes at the Allegheny Academy Juvenile Facility. In 1997, I began to work full-time as a police officer for the City of Pittsburgh. I spent the first several years as a patrol officer in the Zone 2 section of Pittsburgh which encompasses neighborhoods including the Hill District. I remain employed with the PBP and became a Detective in approximately 2007.

In 2013, I was assigned to Narcotics and Vice, where I primarily investigated drug and firearm offenses. I have purchased drugs including marijuana, cocaine, heroin and fentanyl in an undercover capacity on many occasions and have been involved as a back-up officer in many

undercover purchases by other officers. I have been involved in numerous controlled purchases, of various types of drugs, by cooperating individuals. I have obtained numerous search warrants regarding drug and firearm violations and have been involved in numerous similar search warrants obtained by my fellow police officers.

I have been asked to render an expert opinion on many occasions on the state and federal level regarding whether various circumstances show that drugs were possessed for distribution, as opposed to personal use. I have been qualified and testified as a narcotics expert in court more than a dozen times. My relevant trainings include the initial Pittsburgh Police Academy training, as well as the "Top Gun" Narcotics Investigation course, Pennsylvania Electronic Surveillance "A" certification training, ATF "Characteristics of Armed Individuals" training, and interrogation and interview training. My drug and firearm experience come from working not only with many other members of the PBP, but with numerous other local, state and federal investigators including the ATF, FBI and DEA. I have been involved in over 1000 arrests in my career, many involving guns, drugs or both.

This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter. This affidavit is largely based on information obtained from reports of other law enforcement officers, laboratory testing results, and other documents. Based on the probable cause set forth below, your affiant is seeking warrants to authorize searches of the following devices:

## ITEM TO BE SEARCHED

Your affiant respectfully requests authorization to search the following cellular telephones, collectively referred to as the **TARGET DEVICES**:

a. **TARGET DEVICE 1:** A red iPhone recovered from the nightstand of the master bedroom in 1050 Brushton Avenue in Apartment D, currently located at Pittsburgh Bureau of Police (PBP) headquarters at 1203 Western Avenue Pittsburgh, PA 15233

b. **TARGET DEVICE 2:** a black LG cell phone recovered from the nightstand of the master bedroom in 1050 Brushton Avenue in Apartment D, currently located at Pittsburgh Bureau of Police (PBP) headquarters at 1203 Western Avenue Pittsburgh, PA 15233.

c. **TARGET DEVICE 3:** a black TCL cell phone recovered from the nightstand of the master bedroom in 1050 Brushton Avenue in Apartment D, currently located at Pittsburgh Bureau of Police (PBP) headquarters at 1203 Western Avenue Pittsburgh, PA 15233.

As set forth below, there is probable cause to believe that the **TARGET DEVICES** contain evidence of violations of 21 U.S.C. § 841 and 18 U.S.C. §§ 922(g)(1) and 924(c), as described in Attachment A.

## PROBABLE CAUSE

1. In August 2019, City of Pittsburgh Narcotics Detectives opened a narcotics investigation into Torrell JONES selling illegal narcotics in the Pittsburgh area. The investigation led investigators to JONES residence at 7157 Churchland St. Pittsburgh Pa. 15206.

### August 2019 Search Warrant – 7157 Churchland Street

2. On August 13, 2019, Investigators established probable cause and obtained a search warrant from the Honorable Judge Edward Borkowski for 7157 Churchland St.

3. On August 15, 2019 at 0600 hours, City of Pittsburgh Narcotics Detectives executed this search warrant, with Terrence Jones, Glendora Woodson, and Brian White being home. With the residence secured, a systematic search of the residence was conducted with a large quantity of illegal narcotics and eight firearms being recovered from a second floor bedroom to the right. It was later established based on information from Glendora Woodson and indicia recovered from this bedroom, that it was under the control of Torrell JONES. All evidence collected this day was conducted by the City of Pittsburgh Crime Unit. Specifically, investigators are aware that Torrell JONES is Woodson's son, and the brother of Brian White and Terrence Jones. Ms. Woodson identified the second floor right-hand bedroom used to belong to Torrell JONES, that Torrell JONES came to the house often and kept his things in the second floor right-hand bedroom, but did not live in the house anymore. This bedroom will be referred to as "Torrell JONES' bedroom."

4. In Torrell JONES' bedroom, investigators recovered a large amount of indicia that was for Torrell JONES and/or for T&C Business Services LLC. According to records from the Pennsylvania Department of State, this LLC was formed in 2017 by Torrell JONES with an address of 7157 Churchland Street. Investigators also observed a black backpack in this bedroom, with a black plastic bag on top. In the black plastic bag, investigators recovered nearly a kilogram of cocaine (confirmed by subsequent laboratory analysis), and over an ounce of fentanyl (confirmed by subsequent laboratory analysis), and drug packaging material to include boxes of empty stamp bags and a digital scale. In the backpack, investigators recovered eight firearms, several boxes of ammunition, drug packaging material, to include boxes of FoodSense sandwich bags, and other items.

5. In the kitchen of the residence, from a cabinet above the refrigerator, investigators recovered a bag containing four more boxes of FoodSense sandwich bags, a bag containing

numerous dust masks and a pair of latex gloves, and a bag containing several other bags of fentanyl. In total, over 115 grams of raw/bulk fentanyl (confirmed by laboratory analysis) was recovered from this kitchen cabinet. Also recovered from the kitchen was a large stack of indicia for Torrell JONES and his LLC, with a very small amount of indicia for other individuals.

6. Much of the evidence recovered was processed by the Pittsburgh Bureau of Police's Crime Scene Unit for latent print evidence. Latent prints were recovered from the exterior of a FoodSense sandwich box recovered from inside the black backpack from Torrell JONES' bedroom, and from the interior plastic insert of an ammunition box recovered from this same backpack. The latent print from the FoodSense box was determined to belong to Torrell JONES. The latent prints from the plastic insert of the ammunition box were found to belong to a Tevin PERRY. No indicia for Tevin PERRY was recovered from the residence. Furthermore, Torrell JONES has multiple prior convictions, including a conviction from the Western District of Pennsylvania for Possession of a Firearm by a Convicted Felon, from April 15, 2014. Therefore, he is prohibited from possessing firearms and ammunition, and was so prohibited at the time of the August 15, 2019 search warrant. I am aware that it is common for drug dealers to accept trade, particularly firearms and ammunition, in exchange for drugs.

### January 21, 2020 Search Warrant:  1050 Brushton Ave., Apt. D

7. On January 21, 2020, a grand jury sitting in the Western District of Pennsylvania returned an indictment charging Torrell JONES with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(ii), 841(b)(1)(B)(vi), and 841(b)(1)(C), as well as violations of 18 U.S.C. §§ 922(g)(1) and 924(c)(1)(A)(i) in connection with the August 15, 2019 search warrant.

8. On January 29, 2020, a Task Force Officer ("TFO") with the United States Marshals Service applied for a search warrant for 1050 Brushton Avenue Apartment D, Pittsburgh, PA

15206, seeking authorization to enter that residence to search it for the person of Torrell JONES to effectuate the federal arrest warrant issued in connection with the January 21, 2020 indictment.

9. On January 31, 2020, PBP SWAT executed that warrant, while agents and detectives, including your Affiant remained on the perimeter of the apartment building until the residence was secure. During the protective sweep of the residence, a SWAT operator observed a firearm Present at the residence was Torrell JONES, Ciera Wilson (his paramour) and their juvenile child. Once the residence was secure, SWAT notified the investigators, who arrived at the residence. Torrell JONES was taken into custody and transported to PBP Headquarters, and Ciera WILSON provided written and verbal consent to search the residence. WILSON was the leaseholder for the apartment.

10. In the residence, investigators observed a large amount of shoe boxes and containers in the entryway of the apartment, as if someone was in the process of moving in. Following Ms. WILSON providing her consent, your Affiant initiated the consent search in this area. Your Affiant observed a black paper gift bag and a black trash bag on top of the pile of boxes/containers. The black trash bag contained a box of FoodSense sandwich bags, several baggies of white/tan powder,, a digital cale, a red Solo cup, spoons, and plastic cards. Subsequent laboratory testing confirmed that these bags contained over 200 grams of fentanyl.

11. In the black gift bag, investigators recovered 25 bricks of suspected fentanyl, a silver Zale's jewelry box, and a receipt dated 11/18/2019 from Maitri Medicinals-Pittsburgh located at 5845 Centre Ave Pittsburgh, PA 15206. The patient listed on the receipt was Torrell JONES.

12. Ms. Wilson denied ownership of any of the drugs, and indicated that the jewelry in the black gift bag was hers, that Torrell JONES got mad at her, took the jewelry from her, put it in the box and then put it in the black gift bag.

13. In the master bedroom of the apartment, investigators recovered indicia for Torrell JONES, the **TARGET DEVICES**, and the firearm which the SWAT Operators had observed. Specifically, the SWAT Operators had lifted the mattress in the bedroom during the protective sweep, and saw the gun on the boxspring but under the mattress. The firearm was loaded with a round in the chamber.

14. Investigators confirmed that all of the firearms recovered from 7157 Churchland Street and 1050 Brushton Avenue Apartment D had been manufactured outside of the Commonwealth of Pennsylvania.

15. At PBP Headquarters, investigators mirandized Torrell JONES and he agreed to speak with investigators. He immediately indicated that his girlfriend had nothing to do with the guns and drugs recovered from 1050 Brushton Avenue, Apt. D, and that they all belonged to JONES.

16. Your Affiant subsequently entered the interview room to speak wit Torrell JONES. At this time, Torrell JONES immediately stated "that the drugs and gun at his girlfriend's apartment on Brushton Ave. was his, she had nothing to do with it. That he was selling the illegal drugs to make ends meet".

17. Torrell JONES also admitted that the kilogram of cocaine recovered from 7157 Churchland in August was his, saying he had purchased it from a Hispanic male at the Ross Park Mall. Torrell JONES said that after he bought the cocaine, he had someone test it, who told him the cocaine was fake. As described above, however, this substance was found to weigh over 900 grams and tested positive for the presence of cocaine.

18. Torrell JONES also admitted to possessing all of the drugs recovered from the kitchen of 7157 Churchland Street. Your Affiant asked Torrell JONES if the substance recovered from 1050 Brushton Avenue Apartment D was fentanyl, and JONES answered "Yes, it's always fentanyl."

As described above, all of the substances seized from 1050 Brushton Avenue that were tested, tested positive for fentanyl.

19. Your Affiant showed Torrell JONES the TARGET DEVICES (One red I-phone, LG cell phone and a TLC cell phone) that were seized at 1050 Brushton Ave. Apt. D. Torrell JONES stated that the phones were his, TFO Churilla asked Torrell JONES for access to the phones, which Torrell JONES stated "YES". During this time TFO Churilla prepared a consent to search form for the three I phones and Torrell JONES signed it.

20. At that time, however, the TARGET DEVICES were not forensically extracted. Furthermore, based on subsequent communications with Torrell JONES and his attorney, it did not appear necessary to conduct the forensic extractions for the TARGET DEVICES. The TARGET DEVICES have remained in law enforcement custody since JONES' arrest.

21. Torrell JONES was subsequently charged, in a superseding indictment, with various offenses resulting from the 1050 Brushton Avenue, Apartment D. search. This superseding indictment is filed at Criminal No. 20-21.

22. On January 21, 2025, Torrell JONES was scheduled to change his plea from not guilty to guilty in connection with the charges filed at the superseding indictment. However, at the change of plea hearing, the defendant declined to plead guilty, and the matter is now set for rial to begin on August 4, 2025.

23. Based on my training and experience, I know that the recovered amount of narcotics is far more than any typical user would possess. Furthermore, as described above, Torrell JONES admitted to selling drugs to make money.

24. In my 28 years of law enforcement experience, I am aware that cellular phones are an essential tool for drug traffickers, and that drug traffickers utilize these devices to communicate

with suppliers, with customers, and to maintain records of their drug trafficking to include drug ledgers or "owe sheets."  It is a common practice for drug and firearm traffickers who desire to insulate themselves from detection by law enforcement agents to utilize multiple telephones and communication devices, fictitious identities, coded communications, and other counter-surveillance techniques in communicating and meeting with their customers, suppliers, couriers, and other conspirators.  It is not unusual for drug and firearms traffickers to subscribe some or all their telephones in the names of other real or fictitious people.

25. Moreover, it is now a very common practice for drug traffickers to utilize all communication features of their telephones and communication devices, most notably the voice call and text message features, nearly simultaneously to communicate with their conspirators.

26. For example, it is quite common for a particular transaction to be set up and completed using both voice calls and text messages.  In fact, it is now quite unusual for a drug trafficker to utilize solely one feature of a telephone, such as the voice call feature, to further his criminal activities while not also using another feature, such as the text message feature, to further his criminal activities.  Even when a trafficker attempts to do so, he is often not successful because those he communicates with also must similarly limit themselves to utilizing a single cell phone feature and mistakes are often made as a result.

27. I am aware that evidence of drug, firearm, and money laundering crimes can often be found in electronic media, including cellular telephones, laptop computers, cameras, and tablet devices. Such evidence can be found throughout those items, such as in text messages, contact lists indicating the names and numbers of associates, call/text logs indicating calls/text made to and received from associates, online search history files, word processing documents, and photograph and video gallery files.  It should be noted that, with the advance of technology, the distinction

between computers and cellular telephones is quickly becoming less clear. Actions such as internet searching or emailing, in addition to calling and text messaging and photographing, can now be performed from many cell phones. In addition, as noted above, those involved in drug and firearm trafficking crimes commonly communicate using multiple cellular telephones. Contemporaneous possession of multiple cellular telephones is, therefore, evidence of such trafficking.

28. Moreover, the particular numbers of, and the particular numbers dialed by, particular cellular telephones can be evidence of drug trafficking, particularly in light of the fact that it is a practical necessity that drug traffickers communicate with each other, as well as with their customers and suppliers, by telephone. Such numbers can confirm identities of particular associates and the occurrence of certain events.

29. As with most electronic/digital technology items, communications made from an electronic device, such as a cellular telephone or a standard computer, are often saved or stored on the device. Storing this information can be intentional, for example, by saving a text message or a contact or an e-mail.

30. Digital information can also be retained unintentionally. Traces of the path of an electronic communication or of an internet search may be automatically stored in many places on a computer or cellular telephone.

31. In addition to electronic communications, a user's internet activities generally leave traces in the web cache and internet history files. A forensic examiner often can recover evidence that shows when and in what manner a user of an electronic device, such as a computer or a cell phone, used such a device. Electronic files or remnants of such files can be recovered months or even years after they have been downloaded, deleted, or viewed via the Internet. Electronic files downloaded to a hard drive can be stored for years at little or no cost. Even when such files have

been deleted, they often can be recovered months or years later using readily available forensic tools.

32. When a person "deletes" a file on an electronic storage device such as a computer, the data contained in the file often does not actually disappear; rather, that data often remains on the device until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space -- that is, in space on a device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space -- for long periods of time before they are overwritten.

33. In addition, a computer's operating system may also keep a record of deleted data in a "swap" "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages.

34. Thus, the ability to retrieve residue of an electronic file from an electronic storage device depends less on when the file was sent, downloaded, or viewed than on a particular user's operating system, storage capacity, and habits.

35. I am aware that those who illegally possess drugs and guns sometimes take trophy photographs and videos using their cameras and/or cellular telephones of their drugs, firearms, and proceeds and retain them on those devices. In addition, I am aware that drug and firearm traffickers, like law-abiding citizens, sometimes take photographs and videos using their cameras and cellular telephones of themselves with their friends, relatives, and associates and keep the photographs and videos on those devices. When they are taken or retained by drug and firearm traffickers, such photographs and videos can be evidence, and can lead to additional evidence, of

illegal trafficking activity by identifying the traffickers, contraband, and people who are actively assisting and/or supporting the trafficking activity as well as the locations where they live or where they store their drugs, firearms, proceeds, or paraphernalia.

36. It should be noted that data on electronic communication and/or storage devices is often relevant to a criminal investigation by revealing who used a particular device.  In addition, such data can reveal who resided at or who had access to a particular location if, for example, a particular device was found at a particular location (e.g., inside a particular room of a particular residence) and the device contains data demonstrating that it was used by or belonged to a particular person. In that sense, a particular electronic device can be significant indicia linking a particular person to contraband or another criminal activity even if the device itself does not contain the remnants of incriminating communications.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

37. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Also, internet searches and the correlating data can also be stored on the device.  This information can sometimes be recovered with forensic tools.

38. *Forensic Evidence*.   As further described in Attachment A, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crime described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Devices because:

  a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

  b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

  c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

  d. The process of identifying the exact electronically stored information on a storage medium that is necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and pass along to investigators. Whether data stored on a device is evidence may depend on other information stored on the device and the application of knowledge about how a device behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

  e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

39. *Nature of Examination.* Based on the foregoing, and consistent with Rule 41(e) (2) (B), the warrant I am applying for would permit the examination of the Devices consistent with the

warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

40. *Manner of Execution.* Because this warrant seeks only permission to examine devices already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the court to authorize execution of the warrant at any time, whether that be in the day or night.

## CONCLUSION

41. Based on the totality of the circumstances surrounding the investigation into Torrell JONES and your affiant's training and experience in narcotics investigations and the role of cell phones in narcotics trafficking, your affiant believes that there is probable cause to believe that the **TARGET DEVICES**, seized on January 31, 2020, and recovered during the execution of a search warrant at 1050 Brushton Ave. Apartment D. Pittsburgh Pa. 15206, under the control of Torrell JONES, currently being stored at the Pittsburgh Bureau of Police Computers Crime Unit will contain evidence of violations Title 21, United States Code, Sections 841(a)(1) and Title 18, United States Code, Sections 922(g)(1) and 924(c).

42.     Therefore, I submit this affidavit supporting probable cause for a search warrant authorizing the examination of the TARGET DEVICES to seek the items described in Attachment A.

43.     The above information is true and correct to the best of my knowledge, information, and belief.

/s/ *William Churilla*
William Churilla,
Task Force Officer
Drug Enforcement Administration

Sworn and subscribed before me, by telephone
Pursuant to Fed. R. Crim. P. 4.1(b) (2) (A),
This 18th day of February, 2025

_____

THE HONORABLE MAUREEN P. KELLY
UNITED STATES MAGISTRATE JUDGE

# ATTACHMENT A
# LIST OF ITEMS TO BE SEARCHED FOR AND SEIZED

Records, communications stored at the time the warrant is served (i.e., no real-time communications will be intercepted and searched during service), data, and textual and graphic files (including photographs and videos), evidencing who used the device and when and from where or a violation of Title 18, United States Code, Sections 922 or 924, or Title 21, United States Code, Sections 841 or 846, including:

(1) Incoming and outgoing call and text message logs;

(2) Contact lists;

(3) Photo and video galleries;

(4) Sent and received text messages;

(5) Online searches and sites viewed via the internet;

(6) Online or electronic communications sent and received, including email, chat, and Instant messages;

(7) Sent and received audio files;

(8) Navigation, mapping, and GPS files, sim/ sms cards;

(9) Telephone settings, including speed dial numbers and the telephone number for the Subject telephone and related identifying information such as the ESN for the Telephone;

(10) call forwarding information;

(11)    Messages drafted but not sent;

(12)    Voice messages;

(13)    Any deleted information from this cell phone.